## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## PINE BLUFF DIVISION

DASHUJAUHN DANZIE
ADC #106091                                                                    PETITIONER

VS.                                          5:06CV00314 BSM/JTR

LARRY NORRIS, Director
Arkansas Department of Correction                                              RESPONDENT


## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

## INSTRUCTIONS

The following recommended disposition has been sent to United States District Judge

Brian S. Miller.  Any party may serve and file written objections to this recommendation.  Objections

should be specific and should include the factual or legal basis for the objection.  If the objection is

to a factual finding, specifically identify that finding and the evidence that supports your objection.

An original and one copy of your objections must be received in the office of the United States

District Clerk no later than eleven (11) days from the date of the findings and recommendations.  The

copy will be furnished to the opposing party.   Failure to file timely objections may result in waiver

of the right to appeal questions of fact.

If you are objecting to the recommendation and also desire to submit new, different, or

additional evidence, and to have a hearing for this purpose before the United States District Judge,

you must, at the same time that you file your written objections, include a "Statement of Necessity"

that sets forth the following:

1.        Why the record made before the Magistrate Judge is inadequate.

2.      Why the evidence to be proffered at the requested hearing before the United States District Judge was not offered at the hearing before the Magistrate Judge.

3.      An offer of proof setting forth the details of any testimony or other evidence (including copies of any documents) desired to be introduced at the requested hearing before the United States District Judge.

From this submission, the United States District Judge will determine the necessity for an additional evidentiary hearing, either before the Magistrate Judge or before the District Judge.

Mail your objections and "Statement of Necessity" to:

Clerk, United States District Court
Eastern District of Arkansas
600 West Capitol Avenue, Suite A 149
Little Rock, AR 72201-3325

## I. Background

Pending before the Court is a Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254. (Docket entry #1.) Respondent has filed a Response (docket entry #5), to which Petitioner has filed a Reply. (Docket entry #9.) Thus, the issues are joined and ready for disposition.

Before addressing Petitioner's habeas claims, the Court will review the procedural history of this case. On May 24, 1995, a Union County jury convicted Petitioner of the capital murder of Loice Houser. (Docket entry #9, Ex. A.) At trial, the State relied on circumstantial evidence to prove Petitioner's guilt:

On October 27, 1994, the body of Loice M. Houser was found lying facedown in a ditch full of water, alongside a Union County road near Huttig, Arkansas. There was a cut above the victim's left eye, and the victim's left pant pocket was turned inside out and empty. The victim's pickup truck was found in the ditch near the body, in gear with the motor still running. [Petitioner's] thumb print was discovered on the quarter panel of the truck, immediately behind the left door. Two witnesses observed [Petitioner] near the scene of the crime around the time of death.

2

> [Petitioner] admitted that he had been at the crime scene and had looked inside the truck, but denied seeing the victim's body lying in the ditch nearby. In contrast, the two men who discovered the body stated that, upon walking near the truck, they immediately noticed the victim's body in the ditch. Officers later learned that the victim had approximately $275.00 cash in his possession shortly before he was killed. Upon his arrest, [Petitioner] had approximately $216.00 cash. [Petitioner] was charged with capital murder pursuant to the felony-murder provision, and the State sought the death penalty at trial.

*Danzie*, 326 Ark. 34, 930 S.W.2d 310 (1996).  While the State sought the death penalty, Petitioner was sentenced to life imprisonment, without the possibility of parole.  *Id.*

On direct appeal to the Arkansas Supreme Court, Petitioner argued that: (1) the evidence was insufficient to support his conviction; (2) the trial court erred in refusing his request to use expanded juror questionnaires; and (3) African-Americans were systematically excluded from participation on his jury.  On September 23, 1996, the Arkansas Supreme Court affirmed his conviction and sentence. *Danzie v. State*, 326 Ark. 34, 930 S.W.2d 310 (1996).

On November 25, 1996, Petitioner filed a *pro se* Rule 37 Petition, in Union County Circuit Court, raising numerous claims of ineffective assistance of counsel.  (Docket entry #5, Ex. D.)  The Rule 37 Petition remained pending for several years until an evidentiary hearing was conducted on March 28, 2003.[1] (Docket entry #5, Ex. H.)  On September 9, 2003, the Union County Circuit Court entered an Order dismissing the Rule 37 Petition on the grounds that all claims were either without merit or procedurally barred.  (Docket entry #5, Ex. E.)

Petitioner appealed the denial of Rule 37 relief to the Arkansas Supreme Court.  On December 8, 2005, it affirmed.  *Danzie v. State*, 2005 WL 3320860 (Ark. Dec. 8, 2005) (unpublished *per curiam*).

---

[1]Petitioner retained counsel for his Rule 37 hearing and subsequent appeal.

In this federal habeas action, which was filed on December 5, 2006,[2] Petitioner argues that: (1) the State failed to introduce sufficient evidence of his guilt; (2) he was denied a jury consisting of a fair cross-section of the community; and (3) his trial counsel was ineffective.  (Docket entry #1.)

For the reasons explained below, the Court concludes that Petitioner's claims are without merit. Thus, it recommends that the Petition for a Writ of Habeas Corpus be denied and that the case be dismissed, with prejudice.

## II.  Discussion

### A.      Legal Standard for Review

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a habeas petitioner may not obtain relief with respect to any claim adjudicated on the merits in a state court proceeding unless he shows that the prior adjudication: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court. *See* 28 U.S.C. § 2254(d).

A state court decision is contrary to clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the United States Supreme Court] on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). An unreasonable application of clearly established federal law is one in which "the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the

_____

[2]The Court's delay in deciding this habeas case was caused by the parties' difficulties in obtaining a complete copy of the trial transcript.  *See* footnote 6, *infra*, at page 9.

facts of the prisoner's case." *Id.*   A presumption of correctness attaches to factual determinations made by a state court, and a habeas petitioner must rebut this presumption by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).

**B.     Analysis of Petitioner's Habeas Claims**

**1.     Sufficiency of the Evidence Claim**

**a.     Procedural Default**

According to Petitioner, the evidence was not sufficient to support his conviction for capital murder.  A habeas claim which attacks the sufficiency of the evidence is cognizable in a federal habeas proceeding under the Due Process Clause of the Fourteenth Amendment. *See Jackson v. Virginia*, 443 U.S. 307, 321 (1979), *overruled on other grounds by Schlup v. Delo*, 513 U.S. 298 (1995). In reviewing the sufficiency of the evidence, under 28 U.S.C. § 2254, the specific inquiry "is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319.

Respondent argues, among other things, that this claim is in procedural default because it was not preserved for review on direct appeal.  A federal court in a habeas action  "is prohibited from reviewing an issue the state court has resolved on an adequate and independent state ground, including procedural default." *Winfield v. Roper*, 460 F.3d 1026, 1036 (8th Cir.2006).  A state procedural rule is an "independent" state basis for decision when "it is neither intertwined with, nor dependent upon, federal law[.]" *Malone v. Vasquez*, 138 F.3d 711, 717 (8th Cir. 1998) (citing *Ake v. Oklahoma*, 470 U.S. 68, 75 (1985)). Moreover, it is an "adequate" basis for a decision when it meets the test articulated in *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991), *i.e.*, the state procedural

rule "must have been firmly established, regularly followed, and readily ascertainable" when applied to the petitioner. *Malone*, 138 F.3d at 717.

Under the Arkansas Rules of Criminal Procedure in effect at the time of Petitioner's trial, "the failure of a defendant to move for a directed verdict at the conclusion of the evidence presented by the prosecution and at the close of the case because of insufficiency of the evidence will constitute a waiver of any question pertaining to the sufficiency of the evidence." Ark. R. Crim. P. 36.21(b) (1995). Following the close of the State's evidence, defense counsel moved for a directed verdict based on insufficiency of the evidence. (Trial Tr. 1075-85.) The trial court denied the Motion. (Trial Tr. 1085-86.) After the close of all the evidence, defense counsel renewed her Motion. (Trial Tr. 1189.) However, *without making a ruling on the Motion*, the trial court declared a recess to take up jury instructions with counsel. (Trial Tr. 1189-90.)

In Petitioner's direct appeal, a four-Justice majority held that, because Petitioner did not obtain a ruling on his renewed directed-verdict motion, he had failed to preserve his insufficiency of the evidence argument for appellate review:

> This court has held numerous times that the burden of obtaining a ruling is on the movant, and objections and questions left unresolved are waived and may not be relied upon on appeal. *Williams v. State*, 289 Ark. 69, 709 S.W.2d 80 (1986). In *Donald v. State*, 310 Ark. 197, 833 S.W.2d 770 (1992), a case very similar to this one, the appellant moved for a directed verdict at the close of the State's case, and the motion was denied. Donald renewed his motion at the close of all the evidence, as required by Ark. R. Crim. P. 36.21(b), but he failed to obtain a ruling from the court. In that decision, we held that, "the burden of obtaining a ruling is on the movant, and the failure to secure a ruling constitutes a waiver, precluding its consideration on appeal." *Id.* at 198, 833 S.W.2d at 771 (citations omitted). Because [Petitioner] failed to obtain a ruling from the court on his renewed motion for directed verdict, he has not preserved the issue of sufficiency of the evidence for appeal.

*Danzie*, 326 Ark. at 38, 930 S.W.2d at 312. A three-Justice minority conceded that the majority

cited "valid precedent for its holding," but concluded that it was not "appropriate to apply the rule under the facts of this case."[3] *Danzie*, 326 Ark. at 45, 930 S.W.2d at 316 (DUDLEY, J., concurring). Nonetheless, the minority would have affirmed, *on the merits,* because "there was more than sufficient evidence" to convict Petitioner. *Id.*

Thus, a majority of the Arkansas Supreme Court held that Petitioner's insufficiency of the evidence argument was *not* preserved for review on direct appeal based on his failure to follow established Arkansas procedure concerning directed-verdict motions. Accordingly, this Court concludes that Petitioner procedurally defaulted his sufficiency of the evidence argument by failing to properly preserve it for review by the Arkansas Supreme Court in his direct appeal.

Nonetheless, if Petitioner can demonstrate the "cause and prejudice" exception to procedural default, the Court can still proceed to reach the merits of that argument: "[T]he existence of cause for procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 496 (1986). Petitioner contends that his procedural default should be excused because his trial lawyer provided him with ineffective assistance of counsel in not obtaining a ruling on the renewed directed-verdict motion.[4] Alternatively, Petitioner asserts that,

---

[3]Rule 36.21(b) was later recodified as Rule 33.1 of the Arkansas Rules of Criminal Procedure. In 1998, Rule 33.1 was amended to provide that "[i]f for any reason a . . . renewed motion [for directed verdict] at the close of all the evidence. . . is not ruled upon, it is deemed denied for purposes of obtaining appellate review on the question of the sufficiency of the evidence." Ark. R. Crim. P. 33.1(c). Thus, under the modern version of the rule, Petitioner's renewed directed-verdict motion would have been deemed denied.

[4]Where ineffective assistance of counsel is raised as an independent claim for relief in state-court postconviction proceedings, it may constitute cause to excuse procedural default. *See Taylor v. Bowersox* , 329 F.3d 963, 971 (8th Cir. 2003).

regardless of whether he has procedurally defaulted this argument, he is entitled to have this Court review the sufficiency of the evidence because that issue was independently decided on the merits in his Rule 37 appeal.

In his Rule 37 proceeding, Petitioner claimed that his lawyer was constitutionally ineffective because she did not obtain a ruling on his renewed directed verdict motion. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). Based on its finding that there was sufficient evidence establishing Petitioner's guilt, the trial court rejected this argument on the ground that Petitioner could *not* demonstrate any prejudice from his trial counsel's failure to obtain a ruling.[5] (Rule 37 Tr. 126.)

On appeal, the Arkansas Supreme Court affirmed the trial court's denial of Rule 37 relief. Specifically, the Court held that sufficient evidence supported Petitioner's conviction: "[W]e agree with the three justices who concurred in that opinion [Petitioner's direct appeal], and who reached the question, that there was sufficient evidence to prove [Petitioner] guilty. On this point of error, [Petitioner] has failed to show prejudice under the second prong of the *Strickland* test." *Danzie*, 2005 WL 3320860 at *3.

Thus, even though the Arkansas Supreme Court held that Petitioner had procedurally

---

[5]In order to prevail on a claim of ineffective assistance of counsel, Petitioner must demonstrate that his attorney's performance was deficient *and* that the deficiency prejudiced his defense. *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). The first prong requires a showing that counsel's performance fell below an objective standard of reasonableness. *Winfield v. Roper*, 460 F.3d 1026, 1033 (8th Cir. 2006). If objectively unreasonable performance is established, the second prong requires a showing that there is a reasonable probability that, but for counsel's ineffectiveness, the result would have been more favorable to Petitioner. *Lyons v. Luebbers*, 403 F.3d 585, 594 (8th Cir. 2005). Where a court determines that a petitioner has not demonstrated prejudice, under the second prong of *Strickland*, it is unnecessary to examine counsel's performance under the first prong.

defaulted his insufficiency of the evidence claim on direct appeal, it later reviewed the sufficiency of the evidence in the context of deciding Petitioner's ineffective assistance of counsel claim, which he raised in his Rule 37 appeal.   Accordingly, this Court is now free to review Petitioner's insufficiency of the evidence claim in the context of deciding if Petitioner has established: (1) ineffective assistance of counsel as "cause" to excuse his procedural default of that claim on direct appeal; or (2) an independent ineffective assistance of counsel claim, as alleged in his Rule 37 appeal.

### b.    Review of Relevant Evidence Introduced During Petitioner's Trial[6]

Tammy Herrin, a Huttig resident, testified that she knew Houser from his weekly trips to Huttig, and was familiar with the Chevy two-toned truck he drove.[7]   (Trial Tr. 853-54.)   On October 27, 1994, Herrin was driving from Huttig to nearby Felsenthal on "the Olin road" between

---

[6]On March 20, 2009, the Court entered an Order detailing the delay caused by the parties' difficulties in providing the Court with a complete copy of the trial transcript, or the original tape recordings of the trial. (Docket entry #14.)  Without a complete copy of the transcript available for review, the Court advised the parties of its intent to proceed with a recommended disposition based on the appellate abstract of the trial testimony, which was missing.  *Id.*

The parties have now provided the Court with a complete copy of the transcript, which can be pieced together from different filings.  Three volumes of the four-volume trial transcript ("Trial Tr.") are exhibits to Respondent's January 14, 2009 Notice of Filing: (1) Ex. H-1 (Trial Tr. 1-333); (2) Ex. H-2 (Trial Tr. 334-621); and (3) Ex. H-3 (Trial Tr. 1015-1308.).  A fourth volume of the trial transcript is attached to Respondent's March 30, 2009 Notice of Filing: Ex. H-1 (Trial Tr. 622-1014.)

The transcript of the Rule 37 proceedings ("Rule 37 Tr."), which are in two volumes, can be found as exhibits to Respondent's January 14, 2009 Notice of Filing: (1) Ex. I-1 (Rule 37 Tr. 1-162); and (2) Ex. I-2 (Rule 37 Tr. 163-230.)

[7]In opening statements, both the prosecutor and defense counsel explained to the jury that Houser was well known in Huttig as a personal money lender.  (Trial Tr. 824, 834.)  Every Thursday, Houser traveled from his home in Marion, Louisiana, and stopped at the Riverwood International Mill to do business with mill employees on their breaks.  (Tr. Tr. 824, 834.)  During the trial testimony, neither party developed the specifics of Houser's business activities, other than to establish the amount of the collections he made the morning of the crime.  (Trial Tr. 951-58.)

the two towns.[8]   (Trial Tr. 854.)  She was driving behind Houser, who was in his truck, and saw that

he turned off on a gravel road where she knew Houser to park occasionally. (Trial Tr. 854-55.)

Herrin estimated that Houser pulled off around 12:10 or 12:15 p.m.  (Trial Tr. 856.)   As established

by subsequent testimony, at approximately 1:50 p.m. on October 27, Houser's truck and body were

found in the ditch adjacent to this gravel road.

After Houser turned off, Herrin got behind a "white Geo Tracker type vehicle" that had at

least two individuals inside.  (Trial Tr. 855-56.)  This vehicle pulled to the side of the road,  turned

around, and went back toward Huttig.  (Trial Tr. 856.)  Herrin described a "skinnier" person on the

driver's side and a "heavier" person on the passenger's side.  (Trial Tr. 858.)

Ron Jones testified that he lived in Huttig with his brother, Darryl.   (Trial Tr. 859.)

Petitioner, who was known to Ron Jones as "Heavy," was visiting and living with them at the time

Houser was killed.  (Trial Tr. 859.)  On October 27, 1994, Ron Jones, Darryl Jones, LaJeryl Young,

and Luke Jordan were planning to go to El Dorado in Darryl Jones' white Suzuki Sidekick.[9]  (Trial

Tr. 860-61, 864.)

After the four left in the vehicle (with Darryl Jones driving), they saw Petitioner walking near

10th Street in Huttig and picked him up.  (Trial Tr. 861.)  Petitioner got in the  passenger's seat, and

Ron Jones moved to the middle.  (Trial Tr. 863.)   This was a "real tight fit."  (Trial Tr. 863.)

---

[8]Felsenthal is approximately 3 miles northeast of Huttig.  Trial testimony established that Houser's truck and body were found was on a gravel service road off the highway between Huttig and Felsenthal.  Almost all of the fact witnesses at trial were asked to reference a diagram of the scene and the larger Huttig area.  However, this diagram was used only as a demonstrative aid, and was not introduced into evidence.  Without the actual diagram in the record, it is difficult to place some of the witness testimony in geographic context.

[9]El Dorado is approximately 33 miles northwest of Huttig.

Between 11:00 a.m. and 11:30 a.m., they dropped Petitioner off at "the trash compactor" "on the way to Felsenthal." (Trial Tr. 862-63.)  Ron Jones assumed Petitioner was going to walk from there to see a girl, as he had done before. (Trial Tr. 862.)  The original group of four proceeded to El Dorado and then returned to Huttig. (Trial Tr. 867.)   Some time around 4:00 p.m., Ron Jones agreed to drive Petitioner to Newsom's Pharmacy in Strong.[10]  (Trial Tr. 867.)  On the way there, the police stopped the vehicle and arrested them. (Trial Tr. 867-68.)

LaJeryl Young testified that he was a Huttig resident and recognized Houser and his truck. (Trial Tr. 871.)  On October 27, 1994, he went to El Dorado with Ron Jones, Darryl Jones, and Luke Jordan. (Trial Tr. 872.)  He was picked up around noon and sat in the back seat with Jordan. (Trial Tr. 872-73, 875.)  While they were driving through Huttig, Petitioner flagged them down around "the Boardwalk" and asked them for a ride.[11]  (Trial Tr. 873, 879.)

They dropped Petitioner off on the road to Felsenthal. (Trial Tr. 874.)  Young described the road between the two towns as abutting or crossing two sets of railroad tracks. (Trial Tr. 874.)  After "driving by" the first set of tracks, Young noticed Houser's truck parked "over here on this road," but he did not see Houser. (Trial Tr. 874.) They dropped off Petitioner close to the second set of tracks. (Trial Tr. 875.)  The rest of the group then turned around and headed to El Dorado. (Trial Tr. 876.) The spot where Petitioner was dropped off, "around noon," was only about 100 yards from Houser's truck. (Trial Tr. 879.)

Darryl Jones testified that he met Petitioner on a trip to Germany and that, in October of

---

[10]Strong is approximately twelve miles northwest of Huttig.

[11]Young also testified that, earlier in the morning, Petitioner rode with Young's grandmother to pump her gas. (Trial Tr. 880.)

2004, Petitioner was living with him in Huttig.  (Trial Tr. 885-86.)  Petitioner lived in the middle bedroom of the house.  (Trial Tr. 886.)

Darryl Jones recognized Houser and the truck he drove.  (Trial Tr. 887.)  On October 27, 2004, Darryl Jones went to El Dorado with Ron Jones, LaJeryl Young, and Luke Jordan.  (Trial Tr. 888.)  This group departed Huttig in Darryl Jones' white Suzuki Sidekick.  (Trial Tr. 887-88.)  Darryl Jones saw Petitioner walking in the "Boardwalk" area "leaving downtown."  Petitioner stopped them and asked for a ride.  (Trial Tr. 889.)  They took him "around the compactor," where he asked to get out.  (Trial Tr. 889-90.)  When they let Petitioner out, they were traveling on the "Felsenthal Road," and had just passed a "little gravel road."  (Trial Tr. 890.)  Darryl Jones had to stop, turn around, and go back to the point where Petitioner wanted to be dropped off.  (Trial Tr. 890.)  Jones and the others then continued on to El Dorado.  (Trial Tr. 891.)

Later in the day, sheriff's detectives came to Darryl Jones' house and asked to look in Petitioner's room.  (Trial Tr. 893.)  The detectives took some clothes from his room, including a pair of tennis shoes that Darryl Jones guessed belonged to Petitioner and a large pair of jeans.  (Trial Tr. 894-95.)

Luke Jordan testified that he knew of Houser and recognized his truck.  (Trial Tr. 903.)  On October 27, 1994, Jordan was traveling to El Dorado with the Jones brothers and LaJeryl Young.  (Trial Tr. 904.)  They stopped in downtown Huttig and Petitioner got in the car.  (Trial Tr. 905.)

Jordan testified that, when Petitioner got in the car, he said:  "Mr. Houser left," and he pointed in the direction "back down there where [Houser] got killed."  (Trial Tr. 906-07.)  As the group drove in that direction, Jordan saw Houser "on the little dirt road" standing beside his truck urinating.  (Trial Tr. 908.)  After passing Houser, the group in the vehicle turned around and came

back in the opposite direction.  (Trial Tr. 908-09.)  At some point, the vehicle stopped, and Petitioner

got out.  (Trial Tr. 908-09.)  The remainder of the group proceeded to El Dorado and later returned

to Huttig.  (Trial Tr. 910.)

Irwin "Joe" Jackson worked for the Riverwood International Mill ("Riverwood") in Huttig.

(Trial Tr. 915.)  On October 27, 1994, he was working a road grader spreading gravel.  (Trial Tr.

916.)  He was grading "the little road they call the north road, a company road . . . [t]he one coming

right past the trash compactor."  (Trial Tr. 917.)  Between 12:15 and 12:30 p.m. that day, Jackson

was taking his lunch break sitting on the grader.  (Trial Tr. 917.)

Jackson noticed Houser's truck up the road  in the area of "the little gravel road," which was

off of "Felsenthal Road," right before the second railroad tracks crossed Felsenthal Road.[12]  (Trial

Tr. 918.)  He saw Houser's truck roll into the ditch and observed a "huge gentleman standing there

on the road watching this take place."  (Trial Tr. 919.)   According to Jackson, the man did

"something there around the truck," and then walked in Jackson's direction.  (Trial Tr. 920.)  The

man, who Jackson identified in court as Petitioner, eventually walked by him.[13]  (Trial Tr. 921-22.)

He was wearing a toboggan cap, jogging shoes, and the lower part of his pants appeared to be wet.

(Trial Tr. 921.)  After Jackson finished lunch, he continued grading.  (Trial Tr. 923.)

James Mason testified that he worked at Riverwood.  (Trial Tr. 940.)  On October 27, 1994,

Mason was at home for his lunch break between 12:00 and 12:40 p.m.  (Trial Tr. 940.)  Mason's

---

[12]Jackson's grader was parked "by the trash compactor."  (Trial Tr. 927.)  When presented with a photograph taken from the "trash compactor," looking toward the crime scene, Jackson estimated the distance to be "at least 100 yards," or maybe a "tenth of a mile."  (Trial Tr. 928.)

[13]Jackson testified that Petitioner "appeared to be" the man that he saw walk by him.  (Trial Tr. 923.)  On cross-examination, Jackson acknowledged that "I can't just be 100 percent [sure]. All I can say is it appeared to be him."  (Trial Tr. 926.)

13

house was in the area of the "north road." (Trial Tr. 941.)  Around 12:30 p.m., Mason saw a large, heavy-set, black male, about six-feet tall, walking by his house.  (Trial Tr. 941-42.)  Mason noticed that the man's pants appeared to be wet from the knees down.  (Trial Tr. 942.)  Mason identified this man in court as Petitioner.  (Trial Tr. 943.)  Mason was directed to an in-court diagram showing where "they've got the truck parked," and estimated that it would take five minutes to walk from that area to his house.  (Trial Tr. 944.)

Jeffrey Jerome Ellis testified that he lived in Huttig on 14th Street, two blocks from the Jones house.  (Trial Tr. 945, 949.)  On October 27, 1994, some time after 12:00 p.m., Ellis was working in his yard.  (Trial Tr. 946.)   A heavy-set person with a beard and moustache walked by and asked if he could borrow a chain.  (Trial Tr. 948.)  Ellis did not know this person's name, but the person called Ellis "Jeff."  (Trial Tr. 947-48.)  Ellis looked to see if he had a chain, and the person was gone when he returned.  (Trial Tr. 948.)  Ellis identified Petitioner as the person with whom he spoke. (Trial Tr. 948.)

A number of Riverwood employees testified to the money they paid Houser on the morning of October 27, 1994.  J.D. Perrie gave Houser $50 in two twenties and a ten.  (Trial Tr. 951.)  Clyde Wayne gave Houser $25 in a twenty and a five.  (Trial Tr. 954.)  Onetha Young gave Houser a one-hundred dollar bill.  (Trial Tr. 956.)  Ethyl Lee Smith also gave Houser a one-hundred dollar bill.[14] (Trial Tr. 958.)

Union County Sheriff investigator Trocky Ickert responded to the scene of Houser's death and "saw a truck off to the side of a small service road.  The front end of the truck was in the ditch,

---

[14]As indicated previously, it was well known that Houser loaned money and cashed checks for people who worked at Riverwood.  (Trial T. 824, 997.)

and the body of [Houser] was laying up close to the road face down in a ditch or hole." (Trial Tr. 960.)   The truck was at an angle, with the left front more in the ditch than the right front.[15] (Trial Tr. 963.)   The truck was in drive, with the engine running. (Trial Tr. 965.)   Houser's body was face down in water, approximately thirty feet from the truck. (Trial Tr. 972.)   Houser's left pants pocket was turned inside out.[16] (Trial Tr. 975.)

After developing a description of the suspect, Ickert went to the Jones's residence. (Trial Tr. 979.)   Darryl Jones let Ickert in the house.   Ickert found a pair of jogging shoes and blue jeans in Petitioner's room. (Trial Tr. 979-80.)   The shoes were wet. (Trial Tr. 980.)

Union County Sheriff's Investigator Bob Calhoun responded to the scene at 1:51 p.m. (Trial Tr. 939.)   According to Calhoun, Houser's truck and body were located on a gravel service road and ditch "right immediately off the Felsenthal-Huttig highway." (Trial Tr. 989-91.)   Calhoun described this ditch as being two and a half feet deep. (Trial Tr. 990.)   From a position at the driver's side of the truck, he could look to the north and see Houser's body. (Trial Tr. 990.)   Calhoun dusted Houser's truck for fingerprints and pulled a good latent fingerprint of Petitioner's right thumb off the quarter panel immediately behind the left (driver's side) door.[17] (Trial Tr. 992.)

---

[15]Crime scene photographs, authenticated by Ickert, established that Houser's truck was in the ditch on the opposite (oncoming) side of the service road relative to the forward position of the truck. (Trial Tr. 967, 969.)   In other words, the driver's side of the truck angled toward the ditch, while the passenger's side angled toward the road. (Trial Tr. 967, 969.)

[16]The Medical Examiner's report, introduced into evidence as State's Exhibit 19, reflected that when Houser's body was found at the crime scene, "there was no money on his person." (Trial Tr. 1061.)

[17]Arkansas State Crime Lab fingerprint examiner Tom Wynne testified that the fingerprint lifted from the quarter-panel of Houser's truck was the same as a known print of Petitioner's right thumb. (Trial Tr. 1020.)

Later that day, Calhoun developed information establishing Petitioner as a suspect.  He also learned that Petitioner was in a "white Tracker" headed to Strong.[18]  (Trial Tr. 995.)  At 4:00 p.m., Calhoun pulled the "Tracker" over on Highway 182.  (Trial Tr. 995.)  Ron Jones was the driver and Petitioner was in the passenger's seat.  (Trial Tr. 996, 998.)  Calhoun found $216 in Petitioner's left front pocket, in denominations of five twenties, eight tens, seven fives, and one one-dollar bill.  (Trial Tr. 996, 1004.)  After advising Petitioner of his *Miranda* rights, Calhoun asked whether Petitioner "talked to the old white man that loaned the money there in Huttig that day."  (Trial Tr. 997.) Petitioner's response was:  "You're [Calhoun] the only white man I've talked to today."  (Trial Tr. 997.)

Arkansas State Crime Lab Medical Examiner Dr. Frank Peretti performed an autopsy on Houser.[19]   (Trial Tr. 1030.)   Houser had head injuries consisting of: (1) bilateral periorbital eccgymosis (black eyes); (2) a right-ear contusion and abrasion;  (3) lacerations below the eyes; (4) abrasions of the jawbone; (5) red-purple discoloration of the right side of his face; and (6) abrasions of the scalp.  (Trial Tr. 1030-33.)  Houser had no skull fractures or injuries to the brain.  (Trial Tr. 1034.)  Houser had multiple abrasions and contusions on his upper extremities and a laceration on his left arm. (Tr. 1038.) Houser's contusions reflected blunt-force injuries that were more consistent with falling with a hard impact or a forceful slap, as opposed to being hit with a heavy object.  (Trial Tr. 1039, 1045.)  Houser's injuries were also consistent with being grabbed and thrown in the ditch. (Trial Tr. 1046.)  The contusions on Houser's arms were more consistent with the application of

---

[18]In later testimony, Calhoun used the term "Suzuki Sidekick" to describe the "Tracker" vehicle.

[19]Houser was 84-years old, and weighed 143 pounds.  (Trial Tr. 1054-55.)

16

sustained pressure to his arms, as opposed to a one-time fall.  (Trial Tr. 1073.)

Dr. Peretti also found abundant muddy fluid in Houser's trachea and lungs, which indicated that he had inhaled water and drowned. (Trial Tr. 1039.)  Dr. Peretti also found hemorrhages consistent with drowning.  (Trial Tr. 1040.)  Finally, Dr. Peretti found that Houser suffered from arteriosclerotic cardiovascular disease.  (Trial Tr.  1043-44.)

Dr. Peretti opined that the cause of Houser's death was drowning, with blunt-force injuries, and  a contributing factor of  arteriosclerotic cardiovascular disease.[20]  (Trial Tr. 1062.) Dr. Peretti opined that the manner of death was homicide.  (Trial Tr. 1046.)

In presenting his defense, Petitioner's attorney called Mary Barnes, the grandmother of the Jones brothers and LaJeryl Young.  (Trial Tr. 1086-88.)  She lived next door to the Jones house. (Trial Tr. 1086.)  On October 27, 1994, around 11:00 a.m., she asked whether one of her grandsons could ride with her to pump gas in her car.  (Trial Tr. 1087.)  Instead, Petitioner rode with her "back towards Strong" to pump the gas in her car.  (Trial Tr. 1088.)  As they were driving back to Huttig, she saw Darryl Jones' white "jeep" on the road heading towards Strong.  (Trial Tr. 1089-90.)  She thought it took twenty to twenty-five minutes for the entire trip.  (Trial Tr. 1098.)

Harold Jones, the older brother of Ron and Darryl, testified that he had been hired by Lillie Mae Woods to tear down a house in Huttig some time prior to the crime.  (Trial Tr. 1100.)  Harold Jones recruited Petitioner and five or six other men to help.  (Trial Tr. 1101-03.)  Woods paid them

---

[20]Although Dr. Perreti found evidence that Houser had experienced a heart attack some time in the past, he ruled out the possibility that Houser suffered a heart attack before he drowned in the ditch. (Trial Tr. 1071-72.)  Because heart-attack arrhythmia would have interfered with Houser's ability to breath, the heart-attack scenario was inconsistent with the amount of water and mud that Houser had inhaled in his airway.  (Trial Tr. 1071-72.)  Dr. Peretti concluded that Houser was inhaling water for three to five minutes before he died.  (Trial Tr. 1072.)

a total of $300 or $350 for the job.  (Trial Tr. 1103.)  Harold Jones recalled getting paid about $100 from this money and guessed that the remainder was divided among the other men.  (Trial Tr. 1103.)  Jones could not recall exactly when this job was performed.  (Trial Tr. 1105.)

Harold Wisecarver, Houser's son-in-law, testified that he was familiar with Houser's business activities and that he was a man of habit.  (Trial Tr. 1116.)  Wisecarver had seen Houser's billfold "a lot of times when he had a lot of money in it."  (Trial Tr. 1116.)

Petitioner testified that he befriended Darryl Jones in Germany.  (Trial Tr. 1118.)  After Petitioner moved back to the United States, he eventually made his way to Huttig, in August of 1994, to look for work.  (Trial Tr. 1120.)  Petitioner lived with Darryl Jones at his home.  (Trial Tr. 1119.)

On the morning of October 27, 1994, LaJeryl Young woke Petitioner to ask him to ride with his grandmother to pump gas for her.  (Trial Tr. 1120.)  Around 11:00 a.m., Petitioner left with Young's grandmother to go to the BP station on the highway from Huttig to Strong.  (Trial Tr. 1121.)  Petitioner thought it was around 11:40 a.m. when they returned to Huttig.  On the return trip to Huttig, Petitioner saw Darryl Jones driving his "jeep," with Ron Jones in the passenger's seat and Young and Jordan in the back seat.  (Trial Tr. 1122.)  Petitioner knew that this group had planned to go to Felsenthal, and then to El Dorado.  (Trial Tr. 1122-23.)

There was no one at the Jones home when Petitioner returned, and he dressed himself in a multicolored shirt, blue jeans, and "Brahma" hiking boots.  (Trial Tr. 1123.)   Petitioner headed on foot toward Felsenthal because he heard loud stereo music from that direction, and he knew Darryl Jones had a loud stereo system in his "jeep."  (Trial Tr. 1123, 1124, 1127.)  He estimated that he left the house at 12:15 p.m.  (Trial Tr. 1128.)

While walking on a gravel road used by Riverwood, Petitioner came across a truck in the ditch, with the motor running. (Trial Tr. 1126, 1163.) He estimated the time as around 12:23 or 12:25 p.m. (Trial Tr. 1128.) The right rear tire was off the ground and spinning. (Trial Tr. 1126.) He walked to the "other side" of the truck, placed his hand on it, and did not see anyone inside. (Trial Tr. 1126.) He also did not see Houser or a body. (Trial Tr. 1127.) Petitioner saw some water in the area but did not step in it. (Trial Tr. 1153.) His boots did get some mud on them. (Trial Tr. 1153.) Because Petitioner no longer heard any music, he gave up on attempting to find the Jones vehicle and walked back to the house. (Trial Tr. 1128.)

On the way, Petitioner saw a road grader, but not the operator. (Trial Tr. 1128.) Petitioner denied walking by the grader but acknowledged walking by James Mason. (Trial Tr. 1128-29, 1157.) Petitioner denied seeing or speaking to Jeffrey Ellis. (Trial Tr. 1162.) Petitioner walked back to the Jones home, where the Jones group returned around 3:00 p.m. (Trial Tr. 1129.)

Petitioner asked to go to Strong, and Darryl Jones agreed to let Ron Jones drive the "jeep" to take Petitioner there. (Trial Tr. 1130.) On the way to Strong, they were pulled over and arrested. (Trial Tr. 1130.)

On the day of the crime, Petitioner denied ever being in the Suzuki Sidekick with Darryl Jones, Ron Jones, Luke Jordan, and LaJeryl Young. (Trial Tr. 1134.) According to Petitioner, this scenario would have put "people on top of people." (Trial Tr. 1134.) The Sidekick was a subcompact vehicle with front-bucket seats, with a transfer-case stick and a stick-shift between the front seats. (Trial Tr. 1133.) Petitioner was six feet tall and weighed between 310 and 320 pounds. (Trial Tr. 1134-35.)

According to Petitioner, he arrived in Huttig, in August of 2004, with approximately $3000.

(Trial Tr. 1136.)  Additionally, he made some cash doing some "sideline work," such as clearing lots and tearing down a building.[21]   (Trial Tr. 1133.)    On October 27, 1994, Petitioner still had approximately $500 in cash.  This money was divided between the cash he had on him when he was arrested, and other cash he kept at the Jones house.  (Trial Tr. 1136.)  When Petitioner was arrested, he was on his way to Newsom's Pharmacy in Strong to wire about $150 to his son in Dallas, Texas. (Trial Tr. 1139.)  Petitioner testified that he had wired his son $500 and $100 on two occasions between August and October.[22]  (Trial Tr. 1140.)

Petitioner acknowledged that the jeans and shoes seized from the Jones's home belonged to him.  (Trial Tr. 1147.)  Petitioner testified that the jeans were not wet the day of the crime.  (Trial Tr. 1163.)  The shoes were wet because he had muddied them playing football the day before, and he had washed them.  (Trial Tr. 1163-64.)  At the time of the crime, Petitioner had a mustache and a goatee.  (Trial Tr. 1171.)

In the State's rebuttal case, Chuck Matthews testified that, on October 27, 1994, he left the "Eagle Claw Café" after 12:30 p.m. and drove toward Felsenthal.  (Trial Tr. 1129.)  He saw a pickup but did not notice anyone.  (Trial Tr. 1130.)  Coming back the opposite direction around 1:00 p.m., his passenger recognized the truck as Houser's, and they pulled up behind it.  (Trial Tr. 1130.) Matthews "walked around to the side of the truck" and looked in, and then "turned around [and Houser] was laying the ditch just right there . . . right down in the ditch about fifteen feet from the truck."  (Trial Tr. 1130.)  Matthews's passenger, Michael Thompson, testified that, as he was

---

[21]Petitioner recalled getting paid about $200 for the Harold Jones job.  (Trial Tr. 1138.)

[22]In rebuttal, Newsom's Pharmacy employee Colleen Martin testified that pharmacy records indicated that Petitioner had wired $100 one time on October 5, 1994.  (Trial Tr. 1175.)

preparing to get out of the Matthews vehicle, he "looked out the window there, I just looked right straight at [Houser's body]."  (Trial Tr. 1183.)

### c.   Merits of Petitioner's Sufficiency of the Evidence Claim

Based on the foregoing evidence, Petitioner argues that no rational fact finder could have found him guilty of capital murder.  Petitioner characterizes this evidence as proving only "that he had curiously approached and touched a running car and that he had a not-unusual amount of currency on him, not even necessarily congruent with the amount thought to be on Houser."[23] (Docket entry #1 at 5.)  According to Petitioner, the Arkansas Supreme Court's determination that there was sufficient evidence to support the conviction was an unreasonable determination of the facts under 28 U.S.C. § 2254(d)(2).  (Docket entry #9 at 4.)

A person commits capital-felony murder if "he commits or attempts to commit . . . robbery . . . , and in the course of and in furtherance of the felony, or in immediate flight therefrom, he or an accomplice causes the death of any person under circumstances manifesting extreme indifference

---

[23]According to Petitioner, he was convicted of capital-felony murder.  (Docket entry #1 at 7-8.)  Similarly, the Arkansas Supreme Court analyzed Petitioner's conviction under the felony-murder prong of the capital-murder statute.  *See Danzie*, 326 Ark. at 38, 930 S.W.2d at 312 (direct appeal); *Danzie*, 2005 WL 3320860 at *3-4 (Rule 37 appeal).

The record reflects that the jury was instructed, alternatively, on both the felony-murder prong of the capital-murder statute (with robbery as the underlying felony), and the prong for causing the death of a person "with the premeditated and deliberated purpose of causing the death[.]" (Trial Tr. 1195.)  The jury returned a general verdict finding Petitioner guilty of capital murder.  (Trial Tr. 278, 1235.)

Because the Court concludes that the evidence was sufficient to support Petitioner's conviction for capital-felony murder under Ark. Code Ann. § 5-10-101(a)(1) (1995), it is unnecessary to address the sufficiency of the evidence for "premeditated" capital murder under Ark. Code Ann. § 5-10-101(a)(4) (1995).  *See Griffin v. United States*, 502 U.S. 46, 56-60 (1991) (insufficiency of the evidence for one among alternative theories of criminal liability for a charge is not a basis for reversing a general guilty verdict on the charge where there is sufficient evidence supporting at least one theory).

to the value of human life[.]" Ark. Code Ann. § 5-10-101(a)(1) (1995). A person commits robbery "if, with the purpose of committing a felony or misdemeanor theft or resisting apprehension immediately thereafter, he employs or threatens to immediately employ physical force upon another." Ark. Code Ann. § 5-12-101(a) (1995).

The evidence at trial was sufficient to establish, beyond a reasonable doubt, that Petitioner was guilty of capital-felony murder.  Houser was known and recognized in the Huttig community as a money lender.  He had collected at least $275 the morning of this death.  Petitioner asked to be dropped off in the area where Houser was parked on the side of the road, after having pointed out that Houser "had left" town.  Petitioner was the only person seen in that area between the time that Houser was last seen alive, and the discovery of his body.  Houser was found with a pants pocket turned out, with no money on his person.  Witness testimony established that Houser's body was between fifteen and thirty feet from his truck and easily seen in the ditch.

The medical examiner opined that Houser's death was a homicide, and the cause of death was drowning, with blunt-force injuries.  Houser's injuries were consistent with his having been slapped and thrown into the ditch, and/or pressure applied to his extremities.  In the medical examiner's opinion, Houser attempted to breathe, while inhaling water, for three to five minutes before he died.

Furthermore, Petitioner's thumb print was on Houser's truck.  Jackson saw Petitioner standing near the truck as it rolled into the ditch, and saw Petitioner do "something there around the truck." Petitioner was seen walking from that area with wet pants.  The shoes seized from his room that afternoon were wet.  Petitioner was arrested later in the afternoon with $216.

While the case against Petitioner was based on strong circumstantial evidence, the Court does

not find this evidence to be "overwhelming."  However, in the context of this habeas action, the Court must review the alleged insufficiency of the evidence in the light most favorable to the prosecution, not to Petitioner.  *See Jackson v. Virginia*, 443 U.S. 307, 321 (1979).  After doing so, the Court concludes that a rational trier of fact could have found, beyond a reasonable doubt, that Petitioner committed each of the essential elements of capital-felony murder. Accordingly, the Court concludes that the decision of the Arkansas Supreme Court that there was sufficient evidence to support Petitioner's conviction was neither "contrary to" or an "unreasonable application of clearly established federal law," nor was it an "unreasonable determination of the facts." *See* 28 U.S.C. § 2254(d) and (e).[24]  Thus, the Court recommends that Petitioner's first claim for habeas relief be denied.

### 2.    Racial Composition of the Jury Claim

Petitioner asserts that the selection of an all-Caucasian jury violated his Sixth and Fourteenth Amendment rights to a jury consisting of a fair cross-section of the community.  As indicated previously, Petitioner is an African-American, and the victim was Caucasian.

A criminal defendant has a Sixth Amendment right to trial "by an impartial jury of the state and district wherein the crime shall have been committed." U.S. CONST. AMEND. 6.  Similarly, a criminal defendant has a Fourteenth Amendment equal-protection right to challenge the discriminatory selection of state-court juries.

---

[24]Because the evidence is sufficient to support Petitioner's conviction, he has not demonstrated prejudice, under the second prong of *Strickland*.  Thus, the Court need not address the first prong of *Strickland* and make a determination of whether Petitioner has:  (1) made an independent ineffective assistance of counsel claim based on his attorney's failure to obtain a ruling on the renewed directed-verdict motion; or (2) established "cause" to excuse his procedural default on his insufficiency of the evidence claim raised in his direct appeal.

The preceding constitutional provisions have been interpreted by the United States Supreme Court to include the right to a jury drawn from a source fairly representative of the community. *See Taylor v. Louisiana*, 419 U.S. 522 (1975) (holding that the systematic exclusion of women during jury selection, resulting in venire panels that were not "reasonably representative" of the community, denied a criminal defendant of his Sixth and Fourteenth Amendment rights to a jury selected from a fair cross-section of the community). In *Duren v. Missouri*, 439 U.S. 357, 364 (1979), the Court held that, in order for a defendant to establish a prima facie "fair cross-section" claim, he must show that: (1) the group alleged to have been excluded is a "cognizable" or "distinctive group" within the community; (2) representation of this group in venires was not fair and reasonable in relation to the number of such persons in the community; and (3) the under representation was due to the systematic exclusion of the group in the jury selection process.[25]

Twice during voir dire, Petitioner moved to quash the venire panel based on under-representation of African-Americans. (Trial Tr. 656-59, 816-17.) The record is not precise on the number of African-Americans on the venire panel. Defense counsel initially stated that there were fifteen African-Americans on the venire panel, without reference to the total number of panel members. (Trial Tr. 656.) At a later point, defense counsel announced that there were thirteen African-Americans in attendance, and eighty persons who were "non-black," implying a total of

---

[25]In *Duren*, the Court addressed the distinction between challenging the racial composition of a jury under the Sixth and Fourteenth Amendments. In the latter challenge, the defendant also must prove *purposeful discrimination*. *See Duren*, 439 U.S. at 368 n.26. If the defendant makes a prima facie Fourteenth Amendment claim, the burden shifts to the State to prove the absence of discriminatory intent. *Id.* Because intent is not pertinent in a Sixth Amendment claim, the State may rebut a prima facie case by showing only "that a significant state interest [is] manifestly and primarily advanced by those aspects of the jury selection process ... that result in the disproportionate exclusion of a distinctive group." *Id.* at 367-68 (internal footnote omitted).

ninety-three potential jurors on the venire panel.[26]   (Trial Tr. 658.)   In a later comment, defense

counsel stated there were fifteen African-Americans "out of a total of eighty jurors[.]"[27] (Trial Tr.

816.)

There were a total of eight African-Americans  called from the venire panel for individual

questioning (in groups of three).   *See Danzie*, 326 Ark. at 44, 930 S.W.2d at 315; *see also* Trial Tr.

816. Of these eight potential African-American jurors, seven were excused for cause, pursuant to

*Witherspoon v. Illinois*, 391 U.S. 510 (1968), based on their opposition to the death penalty.  *Id.*  The

prosecutor exercised a peremptory challenge to strike the eighth potential African-American juror.

*Id.*  This strike drew a *Batson* challenge from Petitioner.   *See Batson v. Kentucky*, 476 U.S. 79

(1986).  *Id.* The trial court denied the *Batson* challenge because it determined that the State had

established a racially-neutral reason for the strike:  the potential juror's expressed hesitancy to

impose the death penalty.  *Id.*   Thus, an all-Caucasian jury was seated.

At trial, Petitioner argued that, because Union County was thirty percent African-American,

the under representation of African-Americans on the venire panel rendered the panel and resulting

jury invalid.[28]   (Trial Tr. 816-817.)   According to defense counsel, "[w]e got a jury panel that was

---

[26]If thirteen among a total of ninety-three potential jurors were African-American, they would have constituted approximately fourteen percent of the venire panel.

[27]If fifteen among a total of eighty potential jurors were African-American, they would have constituted approximately nineteen percent of the venire panel.

[28]The trial court took judicial notice of the following facts relevant to the racial composition of the jury: (1) Union County had a population of 46,719, of which 33,905 were over the age of eighteen; (2) Union County had 23,070 registered voters; (3) thirty-two percent of the population of Union County otherwise eligible to register to vote had not done so; (4) Union County had 14,061 African-American residents; and (5) thirty percent of Union County's total population was African-American.  *Danzie*, 326 Ark. at 43 n.2, 930 S.W.2d at 315 n2; *see also* Trial Tr. 98-99; 388-99.
    The Union County Circuit Clerk randomly selected the venire panel from the roll of

at most fifteen percent [African-American] and we would just object to the panel as a whole and the jury that was called from the panel."  (Trial Tr. 817.)  On direct appeal, Petitioner argued that African-Americans were systemically excluded from jury participation under *Duren*, *supra*.

The Arkansas Supreme Court concluded that Petitioner satisfied the first element of his prima facie "fair cross-section" claim because African-Americans were a distinctive group in the community.  However, the Court concluded that Petitioner had not shown the remaining elements required to establish a prima facie case under *Duren*:

> As for the second prong of the test, [Petitioner] has failed to offer any proof, other than counsel's conflicting assertions before the trial court and several judicially noticed facts concerning the composition of the population and the number of registered voters in Union County. [Petitioner] has not provided this court with any credible evidence as to the composition of the jury venire called in his case, let alone the entire jury pool or master list from which each venire is chosen.
>
> The test provided in *Duren* requires a fair and reasonable representation of the distinctive group in every venire from which juries are selected, not just the particular venire summoned at a defendant's trial. Without such data, we are left to speculate as to the number of blacks on every jury venire in Union County, and we decline to do so. Lastly, [Petitioner] has produced no evidence which demonstrates that the alleged underrepresentation of blacks is due to a systematic exclusion in the jury-selection system itself.

*Danzie*, 326 Ark. at 43-44, 930 S.W.2d at 315.

As to the third prong of *Duren*, the Court held that Petitioner had not shown how the alleged "under representation" was due to the systematic exclusion of African-Americans in the jury-selection process:

> [Petitioner] merely points to the fact that each black person called during voir dire was not seated on the petit jury due to concerns about the death penalty.
>
> * * *

---

registered voters in Union County.  (Trial Tr. 227, 229, 341.)

Excusing jurors because of their refusal to consider the death penalty in capital cases is not evidence of systematic exclusion of a distinctive group in the community. The United States Supreme Court held: "Death qualification, unlike the wholesale exclusion of blacks, women, or Mexican-Americans from jury service, is carefully designed to serve the State's concededly legitimate interest in obtaining a single jury that can properly and impartially apply the law to the facts of the case at both the guilt and sentencing phases of a capital trial." *Lockhart v. McCree*, 476 U.S. 162, 175-76 (1986).

Thus, even had [Petitioner] provided this court with persuasive authority that blacks as a group more often refuse to impose the death penalty in capital cases, we would nonetheless affirm the trial court's ruling because of the State's legitimate interest in seating only those jurors who can follow the provisions of the law, including the consideration of imposition of the death penalty. [Petitioner] has failed to meet his burden of demonstrating that his constitutional rights were violated, and therefore, we conclude the trial court did not err in refusing to quash [Petitioner's] jury.

*Danzie*, 326 Ark. at 44, 990 S.W.2d at 315-16.

Petitioner now argues that the Arkansas Supreme Court unreasonably applied *Taylor* and *Duren* because "the essential underlying message of those cases was that confidence in the judicial system requires that there not be discrimination in the empaneling of the jury" and that "the empaneling of an all-white jury in a one-third black county in order to try a black man for killing a white man is sufficient evidence of racial bias in the summoning and composition of the jury." (Docket entry #1 at 7.)

While this argument, on its face, has some appeal, it does *not* address the Arkansas Supreme Court's reason for concluding that Petitioner has failed to prove one of the essential elements necessary to make a prima facie showing under *Duren*, *i.e.* Petitioner failed to come forward with sufficient proof of the systematic exclusion of African-Americans in *other venires* in Union County. The Arkansas Supreme Court's reasoning is consistent with the way other Courts have construed and applied *Duren*.  For example, in *United States v. Horne*, 4 F.3d 579, 587 (8th Cir. 1993) (*quoting*

27

*United States v. Womack*, 985 F.2d 395, 397-98 (8th Cir.1993)), the Eighth Circuit held that "evidence of a discrepancy on a single venire panel cannot demonstrate systemic exclusion" under *Duren*. *Accord United States v. DeFries*, 129 F.3d 1293, 1301 (D.C. Cir. 1997) ("Under representation of a cognizable group in a single venire, without evidence of a greater pattern, is insufficient to establish the 'systematic exclusion of the group' required by *Duren*. From a small sample size based on one venire it is difficult to determine whether the disparity is random or systemic.") (internal citations omitted); *Timmel v. Phillips*, 799 F.2d 1083, 1086 (5th Cir.1986) ("[Defendant] must demonstrate . . . not only that [African-Americans] were not adequately represented on his jury but also that this was the general practice in other venire."); *United States v. Miller*, 771 F.2d 1219, 1228 (9th Cir.1985) (noting that the United States Supreme Court's use, in *Duren*, of the plural when describing "venire" from which "juries" are selected indicated that a constitutional violation cannot be based on under representation on a single venire panel).

Other than establishing that Union County has a thirty percent African-American population, and that his venire panel was fourteen to nineteen percent African-American, Petitioner did *not* come forward with *any evidence* establishing disparity in other Union County venire panels. Moreover, Petitioner made no showing of the systematic exclusion of African-Americans in the Union County jury selection process. Under these circumstances, the Court concludes that the Arkansas Supreme Court's disposition of Petitioner's fair cross-section claim was neither "contrary to" nor an "unreasonable application of clearly established federal law," nor was it an "unreasonable determination of the facts." *See* 28 U.S.C. § 2254(d) and (e). Thus, the Court recommends that this claim for habeas relief be denied.

### 3.       Ineffective Assistance of Counsel Claim

Finally, Petitioner argues that his trial lawyer was ineffective for failing to request a "lesser included" first-degree felony murder instruction.[29] *See* Ark. Code Ann. § 5-10-102. Under Arkansas law, "when capital felony murder is charged under Ark. Code Ann. § 5-10-101, first-degree murder is a 'lesser included offense' because the same evidence used to prove the former of necessity proves the latter. Therefore, an instruction on first-degree murder is required." *Hill v. State*, 303 Ark. 462, 469, 798 S.W.2d 65, 69 (1990) (holding that the trial court erred in refusing to give the defendant's requested instruction on first-degree felony murder in a capital-felony murder case). In explaining why separate directed-verdict motions are not required to address charges of capital-felony murder and first-degree felony murder, the Arkansas Supreme Court has noted that the "elements that the State ha[s] to prove in order to obtain a conviction on either charge [are] identical." *Jenkins v. State*, 350 Ark. 219, 85 S.W.3d 878 (2002). If the first-degree felony murder instruction is requested in a capital-felony murder case, it is error for the trial court to refuse it. *See Sanders v. State*, 305 Ark. 112, 805 S.W.2d 953 (1991).

At trial, Petitioner did *not* request the first-degree felony murder instruction. At Petitioner's Rule 37 hearing, defense counsel testified that, in hindsight, she should have requested the lesser-included instruction because she believed that the jury would have sentenced Petitioner to a term of years. (Rule 37 Tr. 178, 224.) However, defense counsel also testified that the decision not to

---

[29]A person commits first-degree felony murder if "he commits or attempts to commit a felony, and in the course of and in the furtherance of the felony or in immediate flight therefrom, he or an accomplice causes the death of any person under circumstances manifesting extreme indifference to the value of human life[.]" Ark. Code Ann. § 5-10-102(a)(1) (1995). "For a Class Y felony [including first-degree murder], the sentence shall be not less than ten (10) years and not more than forty (40) years, or life[.]" Ark. Code Ann. § 5-4-401(a)(1) (1995).

request a lesser-included instruction was a judgment call which she discussed with Petitioner.  (Rule 37 Tr. 178.) Defense counsel specifically recalled a pretrial discussion with Petitioner regarding the issue of lesser-included instructions.  Petitioner told her that he was innocent and that he wanted the jury to find him innocent.  According to counsel, "[Petitioner] didn't want to. . . give [the jury] so many other options to make them think that he wasn't innocent."  (Rule 37 Tr. 211.)  Petitioner also expressed the belief that, if the jury was instructed on first-degree felony murder, "you were just admitting you were guilty."  (Rule 37 Tr. 222.)  According to defense counsel, "[w]e discussed it and agreed at some point.  And that was that, you know.  He wanted, he, we were not going to use lesser included.  We were going to, it was an all or nothing thing."  (Rule 37 Tr. 223.)   Defense counsel testified that she had gone "over and over" the case with Petitioner, and that they thought that it was a "great case."  However, in hindsight, she would have "absolutely" requested the lesser-included instruction.  (Rule 37 Tr. 223-24.)

In Petitioner's Rule 37 appeal, the Arkansas Supreme Court credited defense counsel's explanation of why she did not request the lesser-included first degree murder instruction and concluded that her decision was a matter of trial strategy which did not constitute deficient performance under the first prong of *Strickland*:

> The court found the decision not to request lesser included offense instructions was a matter of trial strategy and not grounds for postconviction relief. We agree. At the postconviction hearing, trial counsel testified that the decision not to request instructions was made after consultation with [Petitioner], and was consistent with his defense of complete denial. This court has held that as a matter of trial strategy, competent counsel may elect not to request an instruction on lesser included offenses. *Henderson v. State*, 281 Ark. 406, 664 S.W.2d 451 (1984) (per curiam).

*Danzie*, 20005 WL 3320860 at *4.

Petitioner argues that the Arkansas Supreme Court's disposition of his ineffective-assistance

30

claim was an unreasonable application of *Strickland* because, for all practical purposes, capital-felony murder and first-degree felony murder are the same offense.  According to Petitioner, a defendant loses nothing by giving the jury the option to sentence him or her to a term of years.  Thus, Petitioner contends that there can be no strategic or tactical justification for not requesting the lesser-included instruction.

In *Beck v. Alabama*, 447 U.S. 625 (1980), the Court held that a death sentence may not be imposed if a jury was not permitted to consider a verdict of guilt on a lesser-included non-capital offense, where there was sufficient evidence to support the lesser-included offense.  The Alabama statutory scheme *prohibited* the instruction of lesser-included offenses in a capital case, and the jury was given only two choices: (1) convicting the defendant of a capital crime, in which case it was required to impose the death penalty; or (2) acquitting the defendant.  The *Beck* Court held that such a statutory scheme was unconstitutional.

In *Pitts v. Lockhart*, 911 F.2d 109 (8th Cir. 1990), the Eighth Circuit considered a question left unanswered in *Beck*:  Is a case considered "capital" or "noncapital" if the death penalty is sought but a life sentence is imposed?  The Court held that such a case must be deemed "noncapital" for purposes of constitutional analysis. *Id.* at 112.   The defendant in *Pitts* was convicted under the Arkansas capital-felony murder statute and argued that he was entitled to habeas relief because the trial court failed to give an instruction on the lesser-included offense of first-degree felony murder. The Eighth Circuit rejected this argument, holding that "the failure to give a lesser included offense instruction in a noncapital case rarely, if ever, presents a constitutional question," and that, even had the trial court committed error, "it did not rise to a level of constitutional significance."  *Id.*

Here, there is no doubt that, if Petitioner's trial counsel had requested the first-degree felony

31

murder instruction, the court would have been required to give it.  However, this Court concludes, as did the Arkansas Supreme Court, that trial counsel's explanation of her decision to forego the first-degree felony murder instruction was reasonable in light of Petitioner's defense that he had no involvement whatsoever with Houser's death.  *See Hall v. State*, 326 Ark. 318, 933 S.W.2d 363 (1996) (holding that defense counsel was not ineffective for failing to request the first-degree felony murder instruction in a capital-felony murder case — "[defendant's] defense was that he had nothing to do with the victim's death, and in fact claimed that two other men were implicated in the beating and killing of the victim. It would have made no sense to instruct on first-degree felony murder when [defendant] contended he did not kill the victim, but someone else did . . . [a]s a matter of strategy, [defense] counsel could have foregone tendering or arguing any lesser offense to the jury, especially since the lower offense was inconsistent with his defense at trial."). This is especially so in this case because the State's evidence against Petitioner, while legally sufficient, was not overwhelming.[30]

Under these circumstances, the Court concludes that the Arkansas Supreme Court's disposition of Petitioner's ineffective assistance of counsel claim was neither "contrary to" or an "unreasonable application of clearly established federal law," nor was it an "unreasonable determination of the facts." *See* 28 U.S.C. § 2254(d) and (e).  Thus, the Court recommends that this

---

[30]The logical extension of Petitioner's premise is that, in *all* capital-felony murder cases, defense counsel should *always* request the first-degree felony murder instruction, and that the failure to do so is objectively unreasonable *as a matter of law*.  The Court is not aware of any authority which supports this proposition, either as a matter of Arkansas state law or federal constitutional law.

With that said, the Court can imagine a capital-felony murder case where the evidence against a defendant is so overwhelming that a denial defense would be utterly implausible.  In such a case, a defense lawyer's decision to forego the first-degree felony murder instruction might be objectively unreasonable.  However, this clearly is not such a case.

claim for habeas relief be denied.

### III.  Conclusion

IT IS THEREFORE RECOMMENDED that the Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254 (docket entry #1) be DENIED, and that this case be DISMISSED, WITH PREJUDICE.

Dated this 10th day of April, 2009.

_____
UNITED STATES MAGISTRATE JUDGE